17-0315 Marriage of Debra Arkin and Karen Arkin as Independent Administrators of Debra Arkin, Petitioner Accountant and Alicia Arkin, Respondent and Police. On behalf of the Department, Mr. Joel S. Oster. On behalf of the Police, Mr. Matthew T. Oster. Hi, Mr. Oster. Thank you, Your Honor. On behalf of Mr. Oster, this is an unconventional case with legal issues that are reasonably conventional and fairly simple. The case, the marriage itself had unconventional financial underpinnings in that the parties were essentially supported by the wealth of Debra Arkin's family during the marriage. What exactly is Huckleberry Pie? Huckleberry Pie was a business that Mr., which Debra Arkin was a partner, had started late in the marriage. It existed for a period of two or three years. It did make some money. Was it an investment type entity? Yes. It didn't make pies. Right. Right. I've never had a Huckleberry Pie myself. I have, but I'm sure that they didn't sell well. Right. But when he got sick, the partnership dissolved. I'm not sure if a bankruptcy occurred, but it went out of business. And it had made some money. Mr. Arkin had made some money for a couple of years from it. But Mrs. Arkin herself acknowledged that over the course of the marriage, 90 percent of the financial support had come from AFA, which is essentially Mr. Arkin's parents and brother. And as the court knows, I'm sure from reading the briefs, in addition to the finances being somewhat unconventional, the trial was also because Mr. Arkin became very ill. Mr. Schwartz, the attorney, was appointed to testify instead, which is a rather difficult proposition at best. I think Mr. Schwartz said he had 25,000 documents to review over a very short period of time. And Mr. Arkin did sit there during the trial and tried to help to the extent that he could. And now it's unconventional before this Court because Mr. Arkin is deceased. But as unconventional as it was in the situation, the unpleasant and unfortunate physical situation, Mr. Arkin allowed himself to go to jail on two occasions when he was very ill rather than pay child support. How are we supposed to accept that? You're not. I would want to say that he wasn't in complete control of his circumstances or faculties at that point in time either, nor of the money. The money that he had access to was provided by other people. Some of that money stopped, according to some sort of directive from the Michael Arkin Trust that, you know, I'm not going to let my daughter's-in-law get this money. Correct. But that didn't mean he could not get the money to support his children. Well, he wasn't. I want to say something legally about that in addition to addressing the facts, but he was not working. He couldn't work. He had no control over what the Arkin Trust had. He was a trustee. He was one of three trustees. And if the other two decided to cut off his distributions, there's nothing in the record to say that he could have easily overcome that. But beyond that, the issues that we have raised, and I did try to make this case, the legal issues presented, unemotional and not subject to subjective judgments about the people involved here. But let us assume that Mr. Devin Arkin was a terrible person for not having paid child support a couple of times. Although in my brief, I think I pointed out that the vast majority of support was paid, and he had other bills that he was paying, and Mrs. Arkin had access to other money. I don't see how, from a legal basis, that touches upon the issues that we've raised. Well, it touches upon the 503G Trust. Well, not really, because we have no, and I said so in both the original brief and the reply brief, we're not questioning the fact that a 503G Trust would have been appropriate in the sense that there was some history of nonpayment. Mr. Arkin was terminally ill at the time the judgment was entered. What we're saying is to order a $750,000 503G Trust from someone who had nothing close to $750,000 is asking for an impossible act to be performed. Part of that, due to his own dealings, that the trial court filed were to basically hide assets. I mean, he sold his share of the family business for $3.6 million to his brother, and his brother doesn't have to pay it back for 15 years. That's right. And he gets $400,000, and he doesn't spend any of it right away toward child support. He gives $100,000 to his nephew. Right. So, I mean, he has access to some money here. Well, I don't think that, I think examining the record would show that not to be true, that he did not have access. He had access to money. When this judgment was entered, he didn't. And he was charged with dissipation for what happened with the life insurance, selling the life insurance benefit. And as a result, Mrs. Arkin got almost all of the marital assets. Now, you can't charge him twice by saying, oh, yeah, also put that $450,000 into a 503G Trust. But his estate has an action against his brother, I think his name was Jed, on that particular note that he owes back. Well, I don't know that they have an action against him. He's obligated to pay interest on a yearly basis, and then the balloon payment takes place in 15 years. So as long as Mr. Arkin complies, or Jed Arkin complies with the payment schedule, there's no action by the estate. Moreover, the – and people can say this was a terrible thing to do. I get it. And – but we're, you know, basically not here to pass moral judgments on people. And there's a long line of cases, including one of them in the last couple of weeks, that say families are entitled to protect their wealth from the ex-spouses or the maybe ex-spouses of their project. And that part's not the part that's of concern. It's the part – his ex-spouse is Alicia. His children are not his ex-spouse. That's correct. But that's what I'm – that's what the point I was getting to. And it would – and let me just finish. And I would assume that if we're protecting the family's wealth, these two children, very – I mean, under 10 years old, or at least at the time of this particular divorce, are part of that family. You're absolutely correct, Your Honor. So it won't actually end until 16 years go by. Okay. There – well, there's a couple things at play there. First of all, the family has always taken care – had always taken care of the children. I mean, it was their finances that supported the children. There's nothing to indicate they won't do that in the future. But as a practical matter, the government's interest in AFA had been transferred into the DART Trust, which was created in 2015, which the children were the beneficiaries of. And it was the – so it's the DART Trust that Judd Arkin owes the interest payments to and the balloon payment 15 years from now. Now, that money is for the benefit of the children. And I did point out in the brief also that Judge Rochford did not make Alicia the trustee of the 503B Trust. It's a corporate trust. That's right. So there is nothing to preclude or nothing to indicate that this will not occur. is that Judd Arkin makes the interest payments to the DART Trust, and the DART Trust supports the children in some fashion or another, but not through Alicia. Is the record clear that the – his interest in AFA was sold while the divorce was pending? Yes, I would say that that's true, yes. Okay. If he had not sold his interest in AFA, would he not have had enough assets to cover the amount of the trust? Well, they had cut off the distributions to him. The asset basically was his right to income. Yeah, but he also had an ownership interest that theoretically could be sold or partitioned or something. Right, although there's no evidence in the record that I think values it or – Well, that evidence is it's worth it to somebody $3.6 million. Well, right, but it's worth it predicated on the distributions that were done to them, which were significant. But if you value something as income, you can value it as an asset, but you can't value it as both. I thought there was some evidence in the trust that once the divorce of Judd was completed, he received distributions from the father's trust, the AFA. I think you are correct, Your Honor, but Judd wasn't going to die when the divorce ended, and Devin was. And Alicia herself had acknowledged that she had seen documents where Michael Arkin had said one of his intentions in creating a trust structure for his estate was that if his children got divorced, the money would be going to the ex-spouses. And, Your Honor, I'm not going to stand here and quarrel with the idea that the kids deserve to be supported, but I also think that the record suggests that there's nothing to indicate that the Arkin family will not support those children. But the Arkin family are not parties here. The party was Mr. Arkin and now his sister as the trustee of the estate or the executive of the estate. The problem is a trial court and this court have an obligation to make sure that children are taken care of, whether we call it best interests, whether we call it the formula that's in the statutory authority, but that's our job. Correct. And we have to do that job in spite of what other people do. I don't disagree with that. So you're just saying it's an impossibility? That's your defense at this point? It's an impossibility? It's an impossibility for Devin Arkin, who was alive at the time that the judgment was entered, to come up with $750,000. I think the judgment gave him seven days to do that. That wasn't a possibility for him to come up with that money to put in the file of three years of trust. There was a motion for reconsideration filed, so the case pended for a while. He died during that period of time until the judge ruled upon it. So now the situation is, as Justice Burke described it, is that, and I think Justice Hutchinson, too, is that Judd Arkin owes payments to the Dart Trust. And whether or not – I'm not a probate lawyer – whether or not the corporate trustee of the 503G Trust can come in and say to the Dart Trust, well, first of all, he may or may not pay. I don't know what happens at that point. I'm not going to pretend to know. But assume he does pay it into the Dart Trust. I don't know that the corporate trustee of the 503G Trust can then go after the Dart Trust for the money. But the legal point that the brief made was at the time that the judgment was entered, there was no way for Devin Arkin to come up with $750,000 in seven days or in any period of time without other people's largess or gratuitous payments to him. But the fact remains he filed this divorce action initially, correct? I think he was the petitioner. He filed it, and then he systematically eroded things that could be used to be considered whether part of his marital estate, non-marital estate, and child support obligation. Well, I don't know that he eroded them other than the – well, Mr. Schwartz testified with regard to the $450,000 that most of it had been spent on support for the family and support for himself. I mean, that's – but, you know, whether the court chooses to believe that or not, or Judge Rothschild chose to believe it or not, she charged him with dissipation. So the $450,000 has been accounted for once. It can't be – it's not supposed to be accounted for twice. That goes back to Zell's and some other cases. But so – and in terms of getting rid of assets, for lack of a better phrase, I don't know if that's true because if Judd Arkin hadn't made the deal to purchase his interest in AFA, then where's the money coming from? Then the trustees – the other two trustees are going, we're not giving you distributions. But instead, Judd Arkin bought the distributions and obligated himself to pay the dark trust of which the children are beneficiaries. So I – But that's – we've already gone through that. That's 15 years from now. I know. It's on a yearly basis. That's the interest. Right. Which is significant. All right. How about the dissipation? The only issue with dissipation that I've questioned is that you can't charge someone with $600,000 of dissipation for an asset that was worth $450,000. And on that one, I think the law is clear that, you know – Okay. Obviously, as we've already done, he can be criticized for what he did, but I don't think that that raises the amount of money that the expectancy was worth. Like, as we said in the brief, there is no evidence that anyone else would have offered more money. Obviously, anyone who bought the death benefit is doing it with the idea of making a profit, not giving them $600,000 to collect $600,000 later on. And there were efforts in court which were rejected for him to have to keep Mrs. Arkin as the beneficiary, and those were rejected. I mean, there was no legal impediment to him doing what he did. And if he had lived, or if events unfolded as they did, in the chronology that they did, that death benefit would have been non-marital property anyway. But the children now are the beneficiaries. Right. And that would have supported the children. Well, that was going to the dog trust, that's correct. But it would have supported the children. The $450,000? Well, if the $600,000, if he had not disposed of it. You're right, but if at that point in time, you know, Mrs. Arkin had come in and said, don't let this happen, and the judge said, okay, I'm not going to. But at the time, I think the basis of her petition at that time was to protect her and her maintenance and not the children. At that time, the statute did not make life insurance to protect maintenance a mandatory provision, which it now does. But again, not just in theory, but in practice, Mrs. Arkin received $450,000 as a result of the finding of dissipation. And you can say, well, the kids would have had another $150,000 had he not done this, but that doesn't make it marital property. Well, she got a judgment for $450,000. Well, you know, what happened post-judgment, to her is the record, I believe they say. But, yeah, she was entitled to it, let's put it that way. I just have one quick question, if you don't mind, on this Rothschild account. You're arguing from basically this one question that was asked of the Guardian, that since payments from the Arkin Associates would not have covered the $72,000, I'm sorry, the amount in the account would not have been enough to cover the $72,000 without those payments, that that was non-marital, or it was not dissipation, correct? Right. I mean, I was looking at the bank records. I mean, you had a beginning balance in January of $31,000. February 3rd, you had one of these 22-5 distributions, right? And then on March 12th, there's a $36,000 payment to the Rothschild. It was the first payment, first check to Rothschild. I mean, that 22-5 wouldn't have covered the entire amount even, at least at that point in time. No, but that Rothschild investment went through two permutations, and I believe in the reply to the appendix, I did include the checks that had been deposited in line with the payments. The initial one, the initial $72,000. Okay, but even if you go back to there, if you inform those of the legal necessities or the legal analyses that are involved, no one's going to deliberately create a marital asset at that point in time if the parties were getting divorced already. And I think Heroy and Steele still apply in that the money wasn't parked there for very long. I know what you're saying. Heroy and Steele, I mean, the amounts are, like, pretty clear. Like, you know, was it Steele where it was the exact same amount that was put in? I don't know. Yeah, Steele was too, right? Steele was $26,833.34, and they went in here, and then they went there. I mean, that's pretty easy. Right. This is just a mishmash. Well, I don't know that it's a mishmash in the sense that it could be that the marital contribution gets reimbursed to the marital estate, but I don't see why the easily traceable non-marital contributions to purchase this investment became marital property. But do you agree that at least in that snapshot that I gave you, there were marital funds and non-marital funds that were used to purchase? Yes, I do. Okay. Thank you. You have an opportunity to reply. Thank you. Mr. Ostro. Good morning, Your Honors. Good morning, Counsel. May it please the Court. I agree with Mr. Ostro that there are some unconventional circumstances in this case, the least of which being that Mr. Arkin is no longer with us. But I think the unconventionality ends there. This is purely conventional in the sense that you have a litigant who, as a trial court found, embarked on a mission with a singular purpose to deprive his wife and, unfortunately, his children of the fruits of a 13-year marriage. It's a circumstance we see all the time, and I think the trial court dealt with it correctly and was well within its discretion to do so. May I ask you a question about this insurance policy? Yes, Judge. There was a motion made to reinstate her. Okay, the divorce is filed. Then he takes her off as beneficiary and puts the kids back. Correct. Then there's a motion made by her, by the wife, to put her back on as beneficiary. Yes. That's denied. Correct. What was the basis for that denial? There's a case, and I forget which district it came out of, but I believe it's Centioli, C-E-N-T-I-O-L-I, which I believe creates bad law. I said they're here and they're there. It essentially says that because the right to be a beneficiary of insurance policy or trust or any sort of instrument is only an expectancy interest, there is no tangible rights worthy of protection. But, I mean, we also have cases like Albrecht from the 3rd District that talk about a spouse has to specifically waive their right to that expectancy. Otherwise, it continues on in the judgment. So, I mean, those things seem to be diametrically opposed. And what seems to be diametrically opposed to me is the trial court's ruling that basically he can do whatever he wants with this policy at one point in time, and the judgment's saying, oh, you're on the hook for the other $150,000 when he takes the $450,000. I think if you look at Section 503B-5 of the IMDMA, a section which, contrary to what counsel said in this brief, has been in existence since, I believe, 2011. And that section says that the beneficiary designation and the proceeds of a term life insurance policy are a marital asset capable of distribution like any other asset. So I think if you look at it from the perspective of but-for Mr. Arkin's actions, surreptitiously selling the death benefit on this policy under fraudulent pretenses, mind you, he lied on the application, there would have been a $600,000 death benefit to allocate. And if you look at... To allocate to whom? I mean, if he died before the judgment was entered, the insurance company would have paid $600,000 to the children. Correct. Okay. Is that part of the marital estate if it's going to the children? Yes, it would still be a marital asset. The policy itself is a marital asset. It was created during the marriage, funded with marital funds. I have no disagreement with that. I mean, it's created during the marriage, funded with presumably marital assets, which, again, is why, you know, when the judge said, no, you can do whatever you want with this policy, I mean, the judge didn't say you... The judge knew apparently that the children were the beneficiaries, but the judge didn't put a limit and say that you have to maintain the children as beneficiaries, did the judge? No. So, I mean, theoretically, he could have done what he wanted at that point in time? Under Sentioli, unfortunately, I think that that's what the law says he could have done. But then that still would have been a marital asset even if his sister was going to get the benefit. Right. And, you know, I think the question, again, goes back to, but for his actions, there would have been this marital asset to allocate. And I think if you look at the trial court's asset distribution, if you look at the balance sheet attached, I think it's clear from the record where that death benefit would have been allocated, where the funds would have been allocated. But instead, Mr. Arkin, deprived the trial court of its ability to make that determination. Now, I'm not aware of... Well, you say it's clear that's where it would have gone. Had he not done some of these things, maybe the allocations would have been different. So I'm not so sure you could say it would have gone there. But I suppose that's the theory you're offering. Well, I think there's support for that, Judge. In the trial court's judgment on page 25, which I believe is page 1914 of the record, where the court says that a just division of the assets is not just numbers on a balance sheet. The court has to consider the assets actually available for distribution. And the trial court touched on the fact that many of the assets awarded to Alicia were likely illusory. And, in fact, they have been. Debts that cannot be collected from Devin's family, for example. But, you know, it strikes me the gist of the estate's argument. There's no question that $450,000 was dissipated by Mr. Arkin. The real nub of the issue is whether or not the trial court was bound by the value that Mr. Arkin got on the open markets. In fact, I think it's disingenuous to place the blame on Alicia when Devin clearly acted with unclean hands here and fraudulently selling this policy, averring under penalty of perjury that he was not involved in a divorce case, that he had spousal consent, and that he was current on his child support, and that the transfer was not designed to defraud his predators. You know, the fact that he got 75 cents on the dollar on the open market for a policy which would and did pay off in a couple months, I don't think that that's the blanket that should fall on Ms. Arkin's shoulders. So, I think, are you saying that really the real issue is within a couple of months this came to fruition? If this had been maybe a year or two or three, we might not be in the same situation. I agree. I fully agree, except Mr. Ostroff's arguments, that the beneficiary, that the rights to a death benefit are an expectancy interest. I certainly think there's different shades of expectancy where you have a healthy 30-year-old male on one side and an individual who, by agreement of everybody, is terminally ill and has months to live. But in any event, the question is... Was this a term policy? Yes, it was. When did it expire, do you think? I do not know the expiration date, Judge. So, if it had expired, I mean, if this had expired after the judgment, the judge probably would have... Ordered payments. Ordered him to keep it, probably for the kids. Right, because she wouldn't have been well within her right to do that under 503 and now even under 504, so I don't think that was... And if it was going to terminate before that, I suppose somebody could have came in on a motion. Right, and again, the judge could have ordered that at least to secure child support under Section 503 of the Marriage Act. I want to address a couple questions that Justice Burke asked regarding AFA and Mr. Arkin's sale of that asset during the divorce proceedings while at a time, as the judge noted, the asset was subject to characterization as marital or non-marital. And, as your Honor noted, there were 400 and something thousand dollars in distributions that Mr. Arkin did not receive. And Mr. Rosler said that it was more or less impossible for Devin to do anything about that, that his co-members, Mr. Arkin and his two siblings were equal members of this LLC, Arkin Family Associates. The operating agreement was amended during these proceedings in contravention of Maryland law. It required a unanimous consent of all three members of the LLC to change the distribution structure. Mr. Arkin sat by and did nothing. He had a viable cause of action against the LLC and against his two co-members to require these distributions, and as the trial court pointed out, he sat on his hands and did nothing. He was complicit in the cessation of the stream of income that the parties had relied upon throughout their marriage, which had been guaranteed throughout their marriage. So for them to suggest that it was impossible, I think, is belied by the record. But now we have a trust that's been ordered by the court, and according to Mr. Astro and I suppose on paper, there's nothing to fund it with. So how do we deal with that? I think that the suggestion that there's nothing to fund it with is based on this artificial distinction, this fiction that Devin Arkin, the individual, is a distinct entity from Devin Arkin, is trustee of the Devin Arkin Revocable Trust. This is the definition of chutzpah. He throws all his money away and throws his hands up in the air and says, I'm poor. I think if there was ever a case that defined unclean hands, this is it. The gist of this argument, and of most of the arguments raised in the brief, is that Mr. Arkin, in his estate now, is asking to be rewarded for his own wrongdoing at my client's expense. The fact of the matter is the trust, the Devin Arkin Revocable Trust, has assets. It has a receivable. And frankly, I think, as we outlined in our brief, these transactions are all an artifice. These transactions were colorable to begin with. And I think there is certainly financial assets available to the estate via this trust, should they wish to comply. But now there is a corporate trustee to be named for this particular trust who may or may not have a – well, certainly, if it's a corporate trustee, will probably bring some sort of an action against the estate. And that would not necessarily – your client would not be involved in that, correct? Under the terms of the judgment, no. But it would provide the protection for the children that the trial court ordered. And I would point out that this – at least on the record before this court, which spans more than 7 to 14 days after the entry of the judgment, this trust has not been created. And Ms. Arkin filed a petition for rule to show cause soon after the judgment because none of the steps outlined in the judgment designed to protect the children were ever followed.  No, because there's been no trust established yet. All right. What are the actual pieces of the dissipation that has been awarded? I mean, I know you asked for over $2 million, and we're in the vicinity of that. Right. So the two at issue on the appeal are the Banner Palace, which we discussed, and this Rothschild Fund. And I believe there were several other investment accounts which were not at issue. With respect to the Rothschild account, I believe, Justice Burke, you hit the nail on the head. If you look at the actual account statements in the record, and they're at E2245 to E2256 or thereabouts, money was coming in and out of this account every which way. This wasn't a case like Heroy or Steele. First of all, both of those cases involved a solely-owned account, not a jointly-owned account like this one, such that the presumption of a gift to the mayoral estate did not arise in those cases. But looking at these statements, the evidence is clear that AFA distributions are going in. Devin's monthly salary is going in. There's a $12,000 IRS refund. All of these strings of income are flowing into this account and then out. There's credit card bills, utility payments, synagogue dues, city and county fees, and tens of thousands of dollars in transfers to PayPal, which are unrelated to this Rothschild investment. This isn't a case like Steele where, just to use a round number, $100,000 goes in on Monday and $100,000 goes out on Friday. This money sat in the account for several months. It went off in a variety of tangents, not just to this Rothschild fund. And I think the argument begs the question, if all these other AFA distributions were placed into a marital account, used for marital expenses, transferred out, why treat this specific investment differently? The only evidence in the record that remotely suggests that this should retain its non-marital character is the testimony of Mr. Swartz, which I believe the question was, was there enough money in the account? He says, I don't believe so. The estate was required to come forth with clear and convincing evidence, evidence which leaves zero doubt in the mind of the trier of facts that these funds retained their non-marital character. I don't believe so. Certainly not at the trial level and definitely not now in a deferential standard review. It does not meet that standard. So that amount is $92,000 something? I believe it was $92,000 and change. Okay. And the last issue the estate raises, and Mr. Osler did touch on it in his opening remarks, relates to this medical debts. And he suggests that the trial court appears to have failed to allocate the debts. And first and foremost, the judgment on its face says otherwise. Paragraph 41 of the findings and paragraph I of the decreed portion of the judgment both address this debt specifically. Allocate the debt to Devon and say, further state that each party should be responsible for all debts incurred, all medical debts incurred prior to judgments. The estate has cited no authority which suggests that the failure to include a debt on a balance sheet as opposed to a judgment is tantamount to failing to allocate it at all. I think more fundamentally, there is no good reason to allocate this debt now to Ms. Arkin. By all accounts, Mr. Arkin's estate is judgment-proof. His assets are all gone. They've been transferred away, likely under fraudulent pretenses. So relieving the estate of a debt which it cannot pay and saddling it on Ms. Arkin would not only be of no benefit to the estate, but it would be a severe detriment to my client, which unfortunately is probably what this estate wants. Ultimately, Your Honors, I think that accepting the estate's arguments would be inimical to the express purposes of the Marriage Act. Section 503 in particular, which are to make provisions, reasonable provisions for supportive spouses during and after a divorce case, and more importantly, to place the parties in a position from which they can begin anew. The estate's arguments are a request to claw back from Alicia what little benefit she received after a 13-year marriage while simultaneously saddling her with debts that she cannot and should not have to pay. I do not believe there is any legal or equitable authority which supports their arguments. The trial court gave a detailed 33-page opinion outlining all of the conducts that occurred during this litigation, categorized the few marital assets the parties had left, and tried to put Ms. Arkin in the best possible place it could, notwithstanding Mr. Arkin's conduct throughout the litigation. Her judgment should be abhorrent. Mr. Ostfeld said that the Arkin family has always provided for the children. Other than the $22,000 payment that came in prior to the divorce action being filed, what other payments are related in the record that the children have been taking care of? Well, the Arkin family purchased the marital residence where the children lived, and of course that purchase was the subject of contentious litigation in Maryland and is still the subject of contentious litigation in Maryland, wherein Devin Arkin was on both sides of the lawsuit as trustee of his father's estate and individually trying to get that money back. And that's on appeal at this point? It's the burden of Ms. Arkin as a single parent to care for her two minor daughters, and Mr. Arkin has put her in a position, unfortunately, where she cannot do so, and to trust her former in-laws when they're suing her in Maryland. I think this court will take judicial notice. There's still litigation going on in the trial court between Michael Arkin, the grandfather, and Ms. Arkin, and the case is pending on appeal now. So why would my client put any faith in her former in-laws who have done nothing but litigate against her since 2014 to care for her children? And was there any effort on the part of your client to somehow bring them in as third parties or other issues here? We looked into it, Judge, and I think it would have ultimately been very difficult because I know Jed lives in Israel, and that's where most of the assets are. So the cost, expense, and difficulty of dragging them into a court in Lake County where there's essentially no personal jurisdiction I think would have been fruitless. Thank you, Your Honor. Mr. Ostrow? Thank you. To say that Alicia received no benefit at the end of this case I think is quite a stretch. If one looks at the balance sheet that was attached to the judgment, she got close to a million dollars. She got a house. Well, a house with $740,000 in equity and retirement funds. But I think didn't the court find a lesser amount of – the court valued it at about six-something? Well, that's a question that I was going to raise with regard to something that Mr. Elster said. You can't – saying that someone's responsible for a debt and then saying I'm going to divide everything 80-20 and then not putting it on the allocation sheet, which the court says is its 80-20 division, makes it not 80-20. So there is a – you do get a distinction between mentioning it in the judgment and not allocating it on the balance sheet. Along with the $221,000 cash to balance, that's not on the balance sheet either. And the balance sheet says the equity in the house is $740,000. I mean, okay, maybe Judge Weissberg gave it two different values. But when she said here's my 80-20 division, it's wrong. It's just mathematically incorrect. With regard to what Justice Burke raised about the life insurance policy, there is no appeal from the order that Judge Sallie entered that did not require Devin Arkin to do anything in particular with the life insurance policy. And as to when the term policy ends, it ends when the premiums stop getting paid. So you may have the right in the term policy to continue to pay the premiums for a set period of time, but at any time you can stop. Now, that's not what happened here. Mr. Arkin paid the premiums until he sold the death benefit and put it into a trust with his children as the beneficiary. No one's placing blame on Alicia here, which is a, you know, the legalities here with regard to trusts having been created are, like Mr. Elster said, I guess in addition to dying of terminal brain cancer and participating in a divorce case, he also should have filed a lawsuit in Maryland at the same time, of which the consequences of which nobody here can say what those would have been, that somehow he should have been litigating in Maryland to make the other two trustees pay him his distributions. But he did litigate in Maryland. He litigated against himself. He didn't litigate as a sole, as a individual person. I think it was the trust that sued or the family that sued that said we loaned this money to buy the house, we didn't. But for him to sue his brother and his father and he's the party litigating against the rest of his family, why would we require that to occur? Well, but, I mean, if it's the matter of his illness and he can't do it, that doesn't make any sense because he did do it. He litigated against himself and his wife, and he tried to get out on a consent decree. You didn't? Okay. I'm not, I mean, I don't want to argue with you. He wasn't the person who took the responsibility for that lawsuit. It was the rest of the family and not, he, you know, that's one thing that I think we're all losing sight of here, which is that the entire time, starting with the, when these people got married, the purchase of the house and the distributions, Devin Arkham was along for the ride. He was not somebody who was working hard at AFA. He was not the person who created the wealth. So to, I think to, you know, draw the conclusion that this all could have come out differently if Devin Arkham had somehow taken issue with the rest of his family, I think is not, just doesn't comport with how things were run. Mr. Bierman, or Mr. Bierman, I'm sorry, Mr. Oster, I'm looking at Mr. Bierman. Were you involved in the trial court proceedings? No, I wasn't. Okay. So when it says debts to the Bierman firm and Miles and Stockbridge, that's not you in any way? No, no. Okay. Nobody owes me any money. We're doing this for the good of the order? Well, thank you. Can I just mention one thing about Cornerstone? There was more than one bank account. And I think we indicated that in the reply brief, that the second purchase of Cornerstone was in the individually owned account of Devin, and the checks which funded that account clearly had come from a non-merital source. So there was more than the exhibits that Mr. Oster had. Did he go at a time when he didn't have any assets that came from a non-merital source? No, at that point in time, he was still getting distribution from AFA. So at the time of the repurchase of Cornerstone. It all happened within a fairly short period of time. In your brief, you said $111,000 went into the, from non-merital funds, went into the joint bank account. I don't recall that. I thought you said $111,000, and then out of that, $72,000 started the Rothschild fund. I think that's correct. Did the other $39,000 stay in the joint bank account? As far as I know. Thank you. Thank you, counsel, for your arguments. We will take the matter under advisement. We're going to take a short recess to prepare for our next case.